U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

Feb 7  11 54 AM '01

CLERK
BY _PO_____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF VERMONT

AMERICAN BOOKSELLERS FOUNDATION
FOR FREE EXPRESSION; AMERICAN CIVIL
LIBERTIES UNION OF VERMONT; ASSOCIATION
OF AMERICAN PUBLISHERS; FREEDOM TO READ
FOUNDATION; NATIONAL ASSOCIATION OF
RECORDING MERCHANDISERS; NORTHSHIRE
INFORMATION, INC.; PSINET INC.; RECORDING
INDUSTRY ASSOCIATION OF AMERICA, INC.;
THE SEXUAL HEALTH NETWORK, INC.,

     Plaintiffs,

     v.

HOWARD DEAN, in his official capacity as
GOVERNOR OF THE STATE OF VERMONT;
WILLIAM H. SORRELL, in his official
capacity as ATTORNEY GENERAL OF THE
STATE OF VERMONT; LAUREN BOWERMAN,
DAN M. DAVIS, KEITH W. FLYNN, DALE O. GRAY,
JAMES A. HUGHES, VINCENT ILLUZZI,
JAMES D. McKNIGHT, JAMES P. MONGEON,
JOEL W. PAGE, JOHN T. QUINN, GEORGE E. RICE,
ROBERT L. SAND, TERRY J. TRONO,
and WILLIAM D. WRIGHT, in their official capacities
as VERMONT STATE'S ATTORNEYS,

     Defendants.

Civil No. _1:01-CV-46_

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### PRELIMINARY STATEMENT

1. The State of Vermont has enacted a broad censorship law that imposes severe
content-based restrictions on the availability, display, and dissemination of constitutionally-

protected speech on the Internet by making it a crime to "sell, lend, distribute, or give away" a variety of materials that are "communicated, transmitted, or stored electronically" and that are "harmful to minors." 1999 Vt. Acts & Resolves 124 (amending 13 V.S.A. §2802(a)).

2.   The United States Supreme Court invalidated a similar federal law on First Amendment grounds in <u>Reno v. ACLU</u>, 521 U.S. 844 (1997), <u>aff'g</u> 929 F. Supp. 824 (E.D.Pa. 1996), and the Third Circuit enjoined enforcement of a second federal law on First Amendment grounds in <u>ACLU v. Reno</u>, 217 F.3d 162 (3rd Cir. 2000), <u>aff'g</u> 31 F. Supp. 2d 473 (E.D. Pa. 1999). In addition, four state laws containing similar content-based restrictions have now been struck down or enjoined as unconstitutional. <u>PSINet, Inc. v. Chapman</u>,108 F. Supp. 2d 611 (W.D. Va. 2000); <u>Cyberspace Communications, Inc. v. Engler</u>, No. 99-2064, 2000 WL 176992 (6th Cir. 2000), <u>aff'g</u> 55 F. Supp. 2d 737 (E.D. Mich. 1999); <u>ACLU v. Johnson</u>, 194 F.3d 1149 (10th Cir. 1999), <u>aff'g</u> 4 F. Supp. 2d 1024 (D.N.M. 1998); <u>American Library Association v. Pataki</u>, 969 F. Supp. 160 (S.D.N.Y. 1997).

3.   Nevertheless, on May 18, 2000, defendant Governor Howard Dean signed into law Act 124, "An Act Relating to Internet Crimes," which is constitutionally unsound. Section 7— the portion of Act 124 challenged by this Complaint—amended 13 V.S.A. § 2802(a). 1999 Vt. Acts & Resolves 124. Section 7 of Act 124 is referred to in this Complaint as "the Act." Exhibit A attached hereto is a copy of relevant sections of Act 124. Exhibit B attached hereto is a copy of 13 V.S.A. § 2802(a) and 13 V.S.A. § 2, as amended by Act 124. Exhibit C attached hereto is a copy of 13 V.S.A § 2801, which defines terms used in section 2802(a).

4.   The Act took effect on July 1, 2000.

5.   Under the Act, any nudity or sexual conduct can potentially be criminal if communicated on the Internet and accessible in Vermont, so long as someone finds it to be

"harmful to minors" under the Act's broad definition.  This could include certain vinyl record album covers displayed on one of plaintiff Northshire Information, Inc.'s Web site, or a detailed, educational description of sexual activity contained on plaintiff The Sexual Health Network's Web site.

6.   Since all speech on the Internet is accessible in Vermont, regardless of the geographical location of the person who posted it, the Act threatens Internet users nationwide and even worldwide.  This threat is underscored by a Vermont criminal statute governing crimes committed partly outside of the state, which provides that "a crime committed by means of electronic communication . . . [may] be considered to have been committed" at the place where the electronic communication was received, even if all of the other necessary predicates to the crime occurred elsewhere.  13 V.S.A. §2 (as amended by Act 124, § 1).  This action seeks to have the Act declared facially unconstitutional and void, and to have the State enjoined from enforcing the Act, by reason of the First and Fourteenth Amendments to, and the Commerce Clause of, the United States Constitution.

7.   The Act regulates speech on the Internet.  The Internet represents the most participatory marketplace of mass speech yet developed.  It is in many ways a far more speech-enhancing medium than radio, television, print, the mails, or the proverbial village green.  Hundreds of millions of people can now engage in interactive communication on a national and global scale via computer networks that are connected to the Internet.  The Internet enables average citizens, with a few simple tools and at a very low cost, to participate in local or worldwide conversations, publish an online newspaper, distribute an electronic pamphlet, and communicate with a broader audience than ever before possible.  The Internet also provides millions of users with access to a vast range of information and resources.  Internet users are far

from passive listeners—rather, they are empowered by the Internet to seek out exactly the information they need and to respond with their own communication if desired.

8. Because of the way the Internet works, the Act's prohibition on distributing to minors material that is "communicated, transmitted, or stored electronically" and that is "harmful to minors" effectively bans distribution of that same material to adults.

9. The Act targets speech that is constitutionally protected for adults. This includes, for example, valuable works of literature and art, safer sex information, examples of popular culture, and a wide range of robust human discourse about current issues and personal matters that may include provocative or sexually oriented language and images.

10. The inevitable effect of the Act, if permitted to stand, will be that Internet content providers will limit the range of their speech, because there are no reasonable technological means that enable users of the Internet to ascertain the age of persons who access their communications, or to restrict or prevent access by minors to certain content. Consequently, the Act reduces adult speakers and users in cyberspace to reading and communicating only material that is suitable for young children.

11. In addition, the Act prohibits speech that is valuable and constitutionally protected for minors, especially older minors.

12. The speech at issue in this case does not include obscenity, child pornography, speech used to entice or lure minors into inappropriate activity, or harassing speech.

13. Plaintiffs represent a broad range of individuals and entities who are speakers, content providers and access providers on the Internet. Plaintiffs post and discuss content including resources on AIDS prevention, visual art and images, literature, and books and resources for gay and lesbian youth.

14. In addition, the Act violates the Commerce Clause of the United States Constitution because it regulates commerce occurring wholly outside of the State of Vermont, because it imposes an impermissible burden on interstate and foreign commerce, and because it subjects interstate use of the Internet to inconsistent state regulations.  An online user outside of Vermont cannot know whether someone in Vermont might download his or her content posted on the Web; consequently, the user must comply with Vermont law or face the threat of criminal prosecution.

15. The Act violates the First and Fourteenth Amendment rights of plaintiffs, their members, their users, and tens of millions of other speakers and users of the Internet and threatens them with irreparable harm.  The Act also violates the Commerce Clause of the United States Constitution as set forth in Paragraph 14.

16. Plaintiffs seek injunctive relief prohibiting enforcement of the Act.

## JURISDICTION AND VENUE

17. This case arises under the U.S. Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3).  It seeks remedies under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and F.C.R.P. 65.

18. Venue is proper in this district under 28 U.S.C. § 1391(b).

## THE PARTIES

19. Plaintiff AMERICAN BOOKSELLERS FOUNDATION FOR FREE EXPRESSION ("ABFFE") was organized as a not-for-profit organization by the American Booksellers Association in 1990 to inform and educate booksellers, other members of the book industry, and the public about the dangers of censorship and to promote and protect the free expression of

ideas, particularly freedom in the choice of reading materials.  ABFFE is incorporated in

Delaware and has its principal place of business in New York City.  ABFFE, most of whose

members are bookstores in the United States, sues on its own behalf, on behalf of its members

who use online computer communications systems, and on behalf of the patrons of their member

bookstores.

20.  Plaintiff AMERICAN CIVIL LIBERTIES UNION OF VERMONT ("ACLU of

Vermont") is the Vermont affiliate of the American Civil Liberties Union, a nationwide,

nonpartisan organization of nearly 300,000 members dedicated to defending the principles of

liberty and equality embodied in the Constitution, including the Bill of Rights.  The ACLU of

Vermont is incorporated in Vermont and has its principal place of business in Montpelier.  The

ACLU of Vermont sues on its own behalf, on behalf of others who use its online computer

communications systems, and on behalf of its members who use online computer

communications systems.  The ACLU of Vermont maintains a Web site at

http://members.aol.com/acluvt/home.html.

21.  Plaintiff ASSOCIATION OF AMERICAN PUBLISHERS, INC. ("AAP") is the

national association of the United States book publishing industry.  AAP's approximately 300

members include most of the major commercial book publishers in the United States, as well as

smaller and non-profit publishers, university presses and scholarly associations.  AAP members

publish hardcover and paperback books in every field and a range of educational materials for

the elementary, secondary, post-secondary and professional markets.  Members of AAP also

produce computer software and electronic products and services.  AAP is incorporated in New

York, and has its principal places of business in New York City and in the District of Columbia.

AAP represents an industry whose very existence depends on the free exercise of rights

guaranteed by the First Amendment. AAP sues on its own behalf, on behalf of its members who use online computer communications systems, and on behalf of the readers of its members' books.

22. Plaintiff FREEDOM TO READ FOUNDATION, INC. ("FTRF") is a non-profit membership organization established in 1969 by the America Library Association to promote and defend First Amendment rights, to foster libraries as institutions fulfilling the promise of the First Amendment for every citizen, to support the rights of libraries to include in their collections and make available to the public any work they may legally acquire and to set legal precedent for the freedom to read on behalf of all citizens. FTRF is incorporated in Illinois and has its principal place of business in Chicago. FTRF sues on its own behalf, on behalf of its members who use online computer communications systems, and on behalf of the patrons of its member libraries.

23. Plaintiff NATIONAL ASSOCIATION OF RECORDING MERCHANDISERS ("NARM") is an international trade association whose more than 1,000 members include recorded entertainment retailers, wholesalers, distributors and manufacturers, many of whom conduct business over the Internet. NARM is incorporated in Delaware and has its principal place of business in Marlton, New Jersey. NARM sues on its own behalf, on behalf of its members who use online computer communications systems, and on behalf of their consumers.

24. Plaintiff NORTHSHIRE INFORMATION, INC. ("Northshire") operates two bookstores in Manchester Center, Vermont. They carry a broad range of books and recordings. Northshire also operates a Web site, with various divisions, on which visitors may obtain information, both written and pictorial, about Northshire and the books and music that it has available. The addresses of the Web site include www.northshire.com, www.vinylbarn.com,

www.Vermontbooks.com, www.Vermontbookstore.com, www.whyvermont.com, and www.usedbooks.northshire.com. Some of the books and recordings described and discussed on the Web site relate to sexual themes and topics, and some of the pictures shown on the site may be considered by some to be "harmful to minors." Northshire is incorporated in Vermont and its principal place of business is in Manchester Center. Northshire sues on its own behalf and on behalf of users of its site.

25. Plaintiff PSINET INC. ("PSINet") is one of the world's largest providers of Internet-related communications services for business. PSINet's services include the retail provision of Internet access to business and consumer markets, the wholesale provision of dial-up as well as dedicated high-speed Internet access to other Internet service providers and telecommunications carriers, Web hosting and application services (such as electronic mail and Internet faxing), electronic commerce solutions, voice-over-IP (Internet Protocol), live audio/video, and other Internet Protocol-based applications. These services are used by tens of thousands of commercial accounts worldwide including a broad range of small, medium-sized, and Fortune 500 businesses, as well as government agencies, non-profit organizations, and educational institutions. PSINet sues on its own behalf and on behalf of its customers.

26. Plaintiff RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC. ("RIAA") is a trade association whose member companies produce, manufacture and distribute over 90% of the sound recordings sold in the United States. The RIAA is committed to protecting the free expression rights of its member companies. RIAA is incorporated in New York, and has its principal office in the District of Columbia. RIAA sues on its own behalf, on behalf of its members who use computer communications systems, and on behalf of listeners to its members' recordings.

27. Plaintiff THE SEXUAL HEALTH NETWORK, INC., ("the Sexual Health Network") is a small, Internet-based company incorporated in the State of Delaware. It maintains a Web site at http://www.Sexualhealth.com. The Sexual Health Network was founded in May, 1996 by Dr. Mitchell Tepper while he was working on his doctoral dissertation at the University of Pennsylvania Program in Human Sexuality Education. Dr. Tepper also has a Master in Public Health degree from the Yale University School of Medicine. Mr. Tepper is currently the President of the Sexual Health Network. The Sexual Health Network is dedicated to providing easy access to sexuality information, education, and other sexuality resources for people with disability, chronic illness, or other health-related problems. The Sexual Health Network sues on its own behalf and on behalf of users of Sexualhealth.com on the World Wide Web.

28. Defendant HOWARD DEAN is the governor of the State of Vermont and is sued in his official capacity as such. He is vested with the executive power of the State of Vermont and has the duty to ensure that the laws of the State of Vermont are faithfully executed. Pursuant to this executive power, Howard Dean signed the Act into law on May 18, 2000.

29. Defendant WILLIAM H. SORRELL is the Attorney General of the State of Vermont and is sued in his official capacity as such. He is the chief law enforcement officer of the State of Vermont. Attorney General Sorrell retains general prosecutorial authority to ensure that the laws (including the Act) are faithfully executed, and has statewide authority to prosecute criminal cases. Pursuant to 3 V.S.A. § 152, defendant Sorrell "may represent the state in all civil and criminal matters," and pursuant to 3 V.S.A. § 153 (a), "shall have the general supervision of criminal prosecutions," including those under the Act.

30. Defendants LAUREN BOWERMAN, DAN M. DAVIS, KEITH W. FLYNN, DALE O. GRAY, JAMES A. HUGHES, VINCENT ILLUZZI, JAMES D. McKNIGHT, JAMES P. MONGEON, JOEL W. PAGE, JOHN T. QUINN, GEORGE E. RICE, ROBERT L. SAND, TERRY J. TRONO, and WILLIAM D. WRIGHT are State's Attorneys for all of the counties in Vermont and are sued in their official capacities as such. They have authority concomitant with that of Attorney General Sorrell to prosecute criminal violations in their respective counties.

## FACTS

### The Internet Generally

31. The Internet is a decentralized, global medium of communication that links people, institutions, corporations and governments around the world. It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individual computers. While estimates are difficult due to its constant and rapid growth, the Internet is currently believed to connect more than 159 countries and close to 322 million users worldwide. Analysts project that the Internet will grow to 490 million users by the year 2002. In addition, approximately 84% of all Internet users use e-mail. In 1998, 3.4 trillion e-mail messages were sent in the U.S.—over 9.3 billion messages a day.

32. Because the Internet merely links together numerous individual computers and computer networks, no single entity or group of entities controls the material made available on the Internet or limits the ability of others to access such materials. Rather, the range of digital information available to Internet users—which includes text, images, sound and video—is individually created, maintained, controlled and located on millions of separate individual computers around the world.

33. The Internet presents extremely low entry barriers to anyone who wishes to provide or distribute information or gain access to it.  Unlike television, cable, radio, newspapers, magazines or books, the Internet provides the average citizen with an affordable means for communicating with, accessing and posting content to a worldwide audience.

**How People Access the Internet**

34. Individuals have several easy means of gaining access to computer communications systems in general, and to the Internet in particular.  Many educational institutions, businesses, and local communities maintain a computer network linked directly to the Internet and enable users to easily gain access to the network.

35. Many libraries provide their patrons with free access to the Internet through computers located at the library.  Some libraries also host online discussion groups and chat rooms.  Many libraries also post their card catalogs and online versions of material from their collections.

36. Internet service providers ("ISPs") allow subscribers to dial onto the Internet by using a modem and a personal computer to access computer networks that are linked directly to the Internet.  Some ISPs charge a monthly fee ranging from $15-50 monthly, but some provide their users with free or very low-cost Internet access.

37. National "commercial online services," such as America Online, serve as ISPs and also provide subscribers with additional services, including access to extensive content within their own proprietary networks.

**Ways of Exchanging Information on the Internet**

38. Most Internet users select user names, e-mail addresses, or both that allow them to log on to the Internet and to communicate with other users.  Many user names are pseudonyms or

pen names that often provide users with a distinct online identity and help to preserve their anonymity and privacy. America Online allows every subscriber to use up to six different "screen names," which may be used for different family members or for separate pseudonyms by an individual. The user name and e-mail address are the only indicators of the user's identity; that is, persons communicating with the user will only know them by their user name and e-mail address (unless the user chooses to reveal other personal information).

39. Once an individual signs on to the Internet, there are a wide variety of methods for communicating and exchanging information with other users.

## E-Mail

40. The simplest and perhaps most widely used method of communication on the Internet is via electronic mail, commonly referred to as "e-mail." Using one of dozens of available "mailers"—software capable of reading and writing an e-mail—a user is able to address and transmit via computer a message to a specific individual or group of individuals who have e-mail addresses.

## Discussion Groups, Mailing Lists, and Chat Rooms

41. Online discussion groups are another of the most popular forms of communication via computer network. Discussion groups allow users of computer networks to post messages onto a public computerized bulletin board and to read and respond to messages posted by others in the discussion group. Discussion groups have been organized on many different computer networks and cover virtually every topic imaginable. Discussion groups can be formed by individuals, institutions or organizations, or by particular computer networks.

42. "USENET" news groups are a very popular set of bulletin board discussion groups available on the Internet and other networks. Currently there are USENET news groups on more

than 30,000 different subjects, and over 100,000 new messages are posted to these groups each day.

43. Similarly, users also can communicate within a group by subscribing to automated electronic mailing lists that allow any subscriber to a mailing list to post a particular message that is then automatically distributed to all of the other subscribers on that list. These lists are sometimes called "mail exploders" or "list servs."

44. "Chat rooms" also allow users to engage in simultaneous conversations with another user or group of users by typing messages and reading the messages typed by others participating in the "chat." Chat rooms are available on the Internet and on commercial online services. Although chat rooms are often set up by particular organizations or networks, any individual user can start an online "chat."

45. Online discussion groups, mailing lists, and chat rooms create an entirely new global public forum—a cyberspace village green—where people can associate and communicate with others who have common interests, and engage in discussion or debate on every imaginable topic.

**The World Wide Web**

46. The World Wide Web (the "Web") is the most popular way to provide and retrieve information on the Internet. Anyone with access to the Internet and proper software can create "Web pages" or "home pages" which may contain many different types of digital information— text, images, sound, and even video. The Web comprises millions of separate "Web sites" that display content provided by particular persons or organizations. Any Internet user anywhere in the world with the proper software can create her own Web page, view Web pages posted by others, and then read text, look at images and video, and listen to sounds posted at these sites.

47. The Web serves in part as a global, online repository of knowledge, containing information from a diverse array of sources, which is easily accessible to Internet users around the world.  Though information on the Web is contained on individual computers, each of these computers is connected to the Internet through Web protocols that allow the information on the Web to become part of a single body of knowledge accessible by all Web users.

48. Many large corporations, banks, brokerage houses, newspapers and magazines now provide online editions of their publications and reports on the Web or operate independent Web sites.  Many government agencies and courts also use the Web to disseminate information to the public.  For example, defendants Howard Dean and William Sorrell have posted Internet Web sites containing information available to the public.  In addition, many individual users and small community organizations have established individualized home pages on the Web that provide information of interest to members of the particular organization, communities, and other individuals.

49. To gain access to the information available on the Web, a person generally uses a Web "browser"—software such as Netscape Navigator or Internet Explorer—to display, print and download documents that are formatted in the standard Web formatting language.  Each document on the Web has an address that allows users to find and retrieve it.

50. Most Web documents also contain "links."  These are short sections of text or image that refer and link to another document.  Typically the linked text is blue or underlined when displayed, and when selected by the user on her computer screen, the referenced document is automatically displayed, wherever in the world it actually is stored.  Links, for example, are used to lead from overview documents to more detailed documents on the same Web site, from tables of contents to particular pages, and from text to cross-references, footnotes, and other forms of

information. For example, the National ACLU's Web page provides links to several other Web pages also offered by the ACLU, including issue pages such as "Immigrants' Rights" and Lesbian and Gay Rights," as well as advocacy pages such as "In the Courts."

51. Links may also take the user from the original Web site to another Web site on a different computer connected to the Internet, a computer that may be located in a different area of the country, or even the world. For example, the National ACLU has a Web page about its Reproductive Freedom Project which also includes links to similar resources elsewhere on the Web, including the Web pages of Planned Parenthood and the National Organization of Women. While linking to these Web sites from the ACLU Web site appears seamless from the user's point of view, in fact these Web sites are each located on entirely separate computers that are not maintained or controlled by the ACLU.

52. Through the use of these links from one computer to another, from one document to another, the Web for the first time unifies the diverse and voluminous information made available by millions of users on the Internet into a single body of knowledge that can be searched and accessed.

53. A number of "search engines" and directories—such as Yahoo, Alta Vista, WebCrawler, and Lycos—are available free of charge to help users navigate the World Wide Web. Once a user has accessed the search service, he or she simply types a word or string of words as a search request and the search engine provides a list of sites that match the search string.

54. As can be seen from the various ways that people can exchange information and communicate via this new technology, the Internet is "interactive" in ways that distinguish it from traditional communication media. For instance, users are not passive receivers of

information as with television and radio; rather, a user can easily respond to the material he or she receives or views online.  In addition, "interactivity" means that Internet users must actively seek out with specificity the information they wish to retrieve and the kinds of communications in which they wish to engage.  For example, a user wishing to read articles posted to a newsgroup must log on to the Internet and then connect to a USENET server, select the relevant group, review the relevant header lines—which provide brief content descriptions—for each message, and then access a particular message to read its content.  Similarly, to gain access to material on the World Wide Web, a user must know and type the address of a relevant site or find the site by typing a relevant search string in one of several available search engines or by activating a Web site link.

### The Range of Content Available on the Internet

55. The information made available on the Internet is as diverse as human thought. Content on the Internet is provided by the millions of Internet users worldwide, and the content ranges from academic writings, to humor, to art, to literature, to medical information, to music, to news, to movie clips, and to human sexuality.  For example, on the Internet one can view the full text of the Bible, all of the works of Shakespeare, and numerous other classic works of literature.  One can browse through paintings from museums around the world, view in detail images of the ceiling of the Sistine Chapel, or hear selections from the latest rap music albums. At any one time, the Internet serves as the communication medium for literally hundreds of thousands of global conversations, political debates, and social dialogues.

56. Although the overwhelming majority of the information on the Internet does not involve nudity or sexual activity, such material is available on the Internet.  For example, an Internet user can read online John Cleland's eighteenth-century novel, Fanny Hill: Memoirs of a

Woman of Pleasure; view the digital photography of Diane Fenster; receive instructions on how to practice safer sex; participate in a question and answer forum on methods for enhancing sexual experiences; and exchange e-mail about a popular new rap music lyric.  Much of this material is similar, if not identical, to material that is routinely discussed in cafes and on the street corners, and that is distributed through libraries, bookstores, record stores, and newsstands.

**The Statutory Language at Issue**

57. On May 18, 2000, defendant Governor Howard Dean signed into law Act 124 § 7 (referred to in this Complaint as "the Act"), effective July 1, 2000, amending 13 V.S.A. § 2802(a) ("Disseminating indecent material to minors").

58. The Act provides as follows:

> 13 V.S.A. § 2802(a) is amended to read:
>
> (a)    No person may, with knowledge of its character and content, sell, lend, distribute or give away to a minor:
>
> > (1)    Any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image, including any such representation or image which is communicated, transmitted, or stored electronically, of a person or portion of the human body which depicts nudity, sexual conduct or sado-masochistic abuse and which is harmful to minors; or
> >
> > (2)    Any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in subdivision (1) of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct or sado-masochistic abuse and which, taken as a whole, is harmful to minors.

1999 Vt. Acts & Resolves 124 (redlines and strikeouts omitted).

59. The term "harmful to minors" is defined by 13. V.S.A. § 2801(6), which provides:

"Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sado-masochistic abuse, when it:

(A) Predominantly appeals to the prurient, shameful or morbid interest of minors; and

(B) Is patently offensive to prevailing standards in the adult community in the state of Vermont as a whole with respect to what is suitable material for minors; and

(C) Is taken as a whole, lacks serious literary, artistic, political, or scientific value, for minors.

60. "Minor" is defined as "any person less than eighteen years old." 13 V.S.A. § 2801(1).

61. Vermont law has broadly defined the material that may be "harmful to minors." For example, "nudity" is defined as "the showing of the human male or female genitals, pubic area or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state." 13 V.S.A. § 2801(2). Another example is the expansive definition of "sexual conduct," which is defined as "acts of masturbation, homosexuality, sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person be a female, breast." 13 V.S.A. § 2801(3). It appears that a mere kiss between two women, or a person placing a hand on a clothed buttock, constitutes "sexual conduct" and that making available a picture of this type could constitute a misdemeanor under the Act.

62. Under 13 V.S.A. § 2805(a), "[a] person who engages in conduct prohibited by section 2802 . . . is presumed to do so with knowledge of the character and content of the material."

63. 13 V.S.A § 2805(b) attempts to provide defenses to liability under the Act, stating

that it is an affirmative defense:

> (1) That the minor as to whom the offense is alleged to have been committed exhibited to the accused a draft card, driver's license, birth certificate or other official or apparently official document purporting to establish that the minor was eighteen years of age or older; or
>
> (2) That the defendant was in a parental or guardianship relationship with the minor; or that the minor was accompanied by a parent or legal guardian; or
>
> (3) That the defendant was a bona fide school, museum or public library, or was a person acting in the course of his employment as an employee or official of such organization or of a retail outlet affiliated with and serving the educational purpose of such organization.

64. Since there is no way for online speakers to check age-verifying documents of

persons who access their content, however, subsection 1 of section 2805(b) provides little or no

defense for prosecutions under the Act.  Even if online speakers had the ability to determine

whether someone accessing their content was a minor, they would have no way of knowing

whether the minor was accompanied by a parent or legal guardian; therefore, subsection 2 also

fails as a defense.  The defense provided in subsection 3 applies only to a limited number of

speakers.  Thus, the vast majority of online speakers are faced with the threat of criminal

prosecutions against which they have no affirmative defenses.

65. A violation of the Act is punishable by imprisonment of not more than one year or a

fine of not more than $1,000, or both.  See 13 V.S.A. § 2807.  A violation therefore constitutes a

misdemeanor.  See 13 V.S.A. § 1.

66. 13 V.S.A. § 2810 further provides that "[w]henever a prosecuting officer within this

state has cause to believe that any person is engaging in or is about to engage in this state in

conduct prohibited by this chapter, he may . . . seek[] a declaratory judgment that the material

involved is in fact harmful to minors and seek[] an injunction against the prohibited conduct."

67. Act 124 also amended 13 V.S.A. § 2, adding that "[a] crime committed by means of an electronic communication, including a telephonic communication, shall be considered to have been committed at either the place where the communication originated or the place where it was received." 1999 Vt. Acts & Resolves 124 § 1. This provision, in combination with the Act, allows the state of Vermont to punish out-of-state speakers whose allegedly harmful content is "received" by a minor in Vermont.

**The Act's Impact on Internet Speech**

68. Because of the nature of the Internet, the Act bans certain constitutionally protected speech among adults.

69. The United States Congress and the states of New Mexico, Virginia, and Michigan previously enacted laws similar to the Act, which were either held unconstitutional or enjoined on First Amendment grounds. Reno v. ACLU, *supra* at ¶ 2; ACLU v. Reno, *supra* at ¶ 2; ACLU v. Johnson, *supra* at ¶ 2; PSINet, Inc. v. Chapman, *supra* at ¶ 2; Cyberspace Communications v. Engler, *supra* at ¶ 2.

70. Speech on the Internet is generally available to anyone with access to this technology. Anyone who posts content to the Web, chat rooms, mailing lists, and discussion groups makes it automatically available to all users worldwide, including minors. Because minors have access to all of these forums, any "harmful to minors" communication in these forums could be punishable under the Act. Knowledge that the recipient is a minor is not required under the Act, and knowledge of the "character and content" of the material is presumed. Due to the very nature of the Internet, virtually every communication on the Internet may potentially be received by a minor and therefore may potentially be the basis for prosecution.

71. Because many of the terms in the Act are overbroad, the Act further chills the speech of content providers on the Web. For example, the Act fails to distinguish between material that is "harmful" for older as opposed to younger minors.

72. Further, the reference to "prevailing standards in the adult community in the State of Vermont as a whole with respect to what is suitable material for minors" is overbroad because, due to the borderless nature of the Internet, it effectively imposes Vermont standards on content providers and users in all other states even if other states have more liberal standards regarding what is considered "harmful to minors." As a consequence, content providers and users of the Web will likely err on the side of caution and not post content on the Web that they would otherwise have posted. In this way, the Act chills speech on the Web and thus causes irreparable harm to the First Amendment freedoms of online speakers.

73. Most of the millions of users on the Internet are speakers and content providers subject to the Act. Anyone who sends an e-mail, participates in a discussion group or chat room, or maintains a home page on the Web potentially is subject to the Act because his or her communication might be accessed by a minor in the State of Vermont. Given the technology of the Internet, there are no reasonable means for these speakers to ascertain the age of persons who access their messages, or for restricting or preventing access by minors to certain content. From the perspective of these speakers, the information that they make available on the public spaces of the Internet either must be made available to all users of the Internet, including users who may be minors, or it will not be made available at all.

74. For instance, when a user posts a message to a USENET discussion group, it is automatically distributed to hundreds of thousands of computers around the world, and the speaker has no ability to control whom will access his or her message from those computers.

Similarly, users who communicate on mailing lists have no way to determine the ages of other subscribers to the list. Finally, content providers on the Web have no reasonable way to verify the age of persons who access their Web sites. For these reasons, there is no practical way for content providers to withhold material that may be "harmful to minors"—as prohibited by the Act—from people younger than 18 years old.

75. Moreover, the Act is overbroad because it allows prosecution even if the sender had no knowledge or reason to know of the recipient's age. Although knowledge of the "character and content" of the material is required, knowledge that the recipient is a minor is not required.

76. Because Internet speakers have no means to restrict minors in Vermont from accessing their communications, the Act effectively requires almost all discourse on the Internet—whether among citizens of Vermont or among users anywhere in the world—to be at a level suitable for young children. The Act therefore bans an entire category of constitutionally protected speech between and among adults on the Internet.

77. In addition, any person who disagrees with or objects to sexual content on the Internet could cause a speaker to be prosecuted under the Act by having a minor view the online speech, resulting in a "heckler's veto" of Internet speech. Further, any person who disagrees with sexual content on the Internet could cause a speaker to fear prosecution under the Act by claiming to be a minor, whether or not the person actually is one.

78. The Act also prohibits older minors from communicating and accessing protected speech. Even if some depictions or discussions of nudity and sexual conduct may be considered by some to be inappropriate or "harmful" for younger minors, many depictions and discussions—including safer sex resources—are valuable, at least for older minors.

79. Even if there were means by which speakers on the Internet could ascertain or verify the age of persons who receive their content (and there are no such means), requiring users to identify themselves and to disclose personal information in order to allow verification of age would prevent Internet users from maintaining their privacy and anonymity on the Internet.

**The Act's Burden on Interstate Commerce**

80. The Act impacts the speech of online speakers across the nation—not just in the State of Vermont—because it is impossible for Internet users to determine the geographic location of persons who access their information.  Internet users elsewhere have no way to determine whether information posted to the Web, discussion groups, or chat rooms will be accessed by persons residing in the State of Vermont.  The various sites on the Internet can be accessed by anyone in the world; therefore, there is no way for speakers to ensure that residents of Vermont will not receive their communications.  Thus, all users, even if they do not reside in Vermont or intend to communicate with residents of Vermont, must comply with the Act.

81. The interstate reach of the Act is underscored by Act 124's amendment to 13 V.S.A. § 2.  While 13 V.S.A. § 2 is not itself a subject of challenge in this Complaint, the amendments thereto provide that the situs of crimes committed by electronic communication, including the transmittal of "harmful to minors" material, will be considered "either the place where the communication originated or where it was received."  Thus, for example, an Internet user in New York who posts a message to an online discussion group may face prosecution in Vermont, if a minor in Vermont reads the message.

82. The Act unjustifiably burdens interstate commerce and regulates conduct that occurs wholly outside the State of Vermont.  The Act chills speakers outside of Vermont and curtails speech that occurs wholly outside the borders of Vermont, thereby causing irreparable harm.

Like the nation's railways and highways, the Internet is by its nature an instrument of interstate commerce. Just as goods and services travel over state borders by train and truck, information flows across state (and national) borders on the Internet. Internet content providers that are located outside of Vermont, such as the National ACLU and The Sexual Health Network, as well as people participating in chat rooms, newsgroups, or mail exploders, have no feasible way to determine whether their information will be accessed or downloaded by someone who is located in Vermont. Just as a user of the Internet cannot identify the age of another user of the Internet, one also cannot identify where a particular user or speaker resides, or from where a particular user may be accessing or downloading information on the Internet. Due to the nature of the technology, a non-Vermonter, even if he or she has no desire to reach anyone in Vermont, will be forced to self-censor his or her speech on the Internet in order to comply with the Act and avoid the possibility that a minor from Vermont will gain access to this information, thereby subjecting the speaker to prosecution in Vermont. Therefore, the Act interferes significantly with the interstate flow of information and with interstate commerce.

83. Moreover, interstate and international computer communications networks—like the nation's railroads—constitute an area of the economy and society that particularly demands uniform rules and regulations. The states of New York, New Mexico, Virginia and Michigan previously enacted laws similar to the Act, which were enjoined on Commerce Clause grounds because of the inconsistent obligations imposed on online speakers across the country. PSINet, Inc. v. Chapman, *supra* at ¶ 2; Cyberspace Communications, Inc. v. Engler, *supra* at ¶ 2; ACLU v. Johnson, *supra* at ¶ 2; American Library Association v. Pataki, *supra* at ¶ 2; see also ACLU v. Reno, 31 F. Supp. 2d 473 (E.D. Pa. 1999), aff'd 217 F.3d 162 (3rd Cir. 2000) (declaring federal

Child On Line Protection Act unconstitutional on the ground that it was impossible to determine "community standards" for the Internet).

84. Because the definition of "harmful to minors" in 13 V.S.A. §2801(6) depends in part upon "prevailing standards in the adult community in the State of Vermont as a whole," the Act effectively imposes regulations on interstate speech that conflict with the community standards of other States and their local communities.  If each state implements its own regulations, as Vermont has done, regarding what information can be legally distributed via this new technology, interstate commerce will be greatly inhibited and disrupted as persons around the world try to discern what can and cannot be communicated in the many different jurisdictions connected to these networks.

**The Ineffectiveness of the Act and the Effectiveness of Alternative Means**

85. Because of the global nature of the Internet, defendants cannot demonstrate that the Act is likely to reduce the availability in Vermont of material that may be "harmful to minors" on the Internet.

86. It is estimated that approximately 40% of the content provided on the Internet originates abroad.  All of the content on the global Internet is equally available to all Internet users worldwide and may be accessed as easily and as cheaply as content that originates locally. Because it is not technologically possible to prevent content posted abroad from being available to Internet users in the State of Vermont, the Act will not accomplish its purported purpose of keeping inappropriate content from minors in Vermont.

87. Conversely, there are many alternative means that are more effective at assisting parents in limiting a minor's access to certain material if desired.

88. Commercial online services like America Online provide features that subscribers may use to prevent children from accessing chat rooms and to block access to Web sites and news groups based on keywords, subject matter, or specific newsgroup.  These services also offer screening software that blocks messages containing certain words, and tracking and monitoring software to determine which resources a particular online user, such as a child, has accessed.  They also offer children-only discussion groups that are closely monitored by adults.

89. Online users also can purchase special software applications, known as user-based blocking programs, that enable them to control access to online resources.  These applications allow users to block access to certain resources, to prevent children from giving personal information to strangers by e-mail or in chat rooms, and to keep a log of all online activity that occurs on the home computer.

90. User-based blocking programs are not perfect, both because they fail to screen all inappropriate material and because they inadvertently block valuable Internet sites.  However, a voluntary decision by concerned parents to use these products for their children constitutes a far less restrictive alternative than the Act's imposition of criminal penalties for protected speech upon the universe of Internet users.

**The Act's Impact on the Plaintiffs**

91. Plaintiffs interact with and use the Internet in a wide variety of ways, including as content providers, access providers, and users.  The Act burdens plaintiffs in all of these capacities.  Plaintiffs who are users and content providers are subject to the Act.  These plaintiffs fear prosecution under the Act for communicating, sending, displaying, or distributing material that might be deemed by some to be "harmful to minors" under the Act.  They also fear liability for material posted by others to their online discussion groups, chat rooms, mailing lists, and

Web sites.  Plaintiffs have no way to avoid prosecution under the Act and are left with two equally untenable alternatives:  (i) risk prosecution under the Act, or (ii) attempt to engage in self-censorship and thereby deny adults and older minors access to constitutionally protected material.

## American Booksellers Foundation for Free Expression

92. Plaintiff ABFFE has hundreds of bookseller members who are located from coast to coast, as well as in the State of Vermont, many of whom sell materials that contain nudity or descriptions of the nude human body, and which deal frankly with the subject of human sexuality.  ABFFE's members are not "adult bookstores."  Many member bookstores use the Internet and electronic communications to obtain information and excerpts of books from publishers.  For example, member booksellers may review current popular titles such as Nymph by Francesa Lia Block, Pictures & Passion: A History of Homosexuality in the Visual Arts by James W. Saslow, and American Pastoral by Philip Roth, which include passages or images describing nudity and sexual conduct.  Some member bookstores also have their own Web pages that discuss the contents of books sold in stores.

93. ABFFE members' right to learn about, acquire, and distribute material containing nudity and sexual conduct, and their patrons' right to purchase such materials, will be seriously infringed by the Act if it is not enjoined because ABFFE members and the publishers with whom they transact business will be forced to self-censor or risk prosecution under the Act.

## American Civil Liberties Union of Vermont

94. In addition to their legal advocacy to uphold the Bill of Rights, plaintiff ACLU of Vermont and the National ACLU have long devoted considerable resources to public education about civil liberties.  Since 1993, the ACLU's public education efforts have included extensive

online resources that offer electronic copies of ACLU publications, reports, court briefs, news releases, and other material related to the ACLU's legal, legislative, educational and advocacy work.

95. The National ACLU maintains its extensive online resources on the Internet's World Wide Web.  The ACLU of Vermont's Web site, in addition to offering its own resources, provides links to the National ACLU's Web site.  Some of the ACLU's online resources contain sexual subject matter or nudity.  Examples include copies of ACLU court briefs in cases involving arts censorship, obscenity, and discrimination against gays and lesbians.

96. The National ACLU also hosts unmoderated online discussion groups that allow citizens to discuss and debate a variety of civil liberties issues.  These services allow online users to express their uncensored views on civil liberties issues and to interact with ACLU staff or featured speakers.  Many of the communications in the ACLU's discussion groups have included and will continue to include sexual content, such as a discussion of teen pregnancy and teen parenthood, a discussion of sexual privacy and state laws on criminal sodomy, and a discussion of the defense of pornography and other erotic expression under the First Amendment.

97. The ACLU does not moderate its computer communications systems because such editing or censorship would be antithetical to the ACLU's belief in freedom of speech. Furthermore, the ACLU considers minors to be an important audience for its online resources. The ability of minors to participate in chat rooms or discussion groups with other minors and with adults is a vital part of their education.  It is particularly important that minors be able to access information about their rights and to learn about and debate controversial issues.

98. In addition to its own online resources, ACLU staff and members use other online services such as e-mail, outside discussion groups, and online mailing lists as an important low-

cost method of communicating and sharing documents and information with each other and with those outside of the ACLU.  Some of this material also discusses nudity or sexual conduct, such as descriptions of the human body or human reproduction.

99. If the Act is not enjoined, ACLU of Vermont and the National ACLU will be compelled either to refrain from offering constitutionally protected civil liberties materials and from sponsoring constitutionally protected political debates or to face potential criminal prosecution.

**Association of American Publishers, Inc.**

100.    Plaintiff AAP sues on behalf of its members who are content providers and users of the Internet.  Although their businesses are primarily based on print publishing, AAP's members are very actively involved in the Internet.  AAP's members create electronic products to accompany and supplement their printed books and journals; create custom educational material on the Internet; communicate with authors and others, receive manuscripts, and edit, typeset, and design books electronically; transmit finished products to licensed end-user customers, communicate with bookstores and other wholesale and retail accounts; and promote authors and titles online.

101.    Many of AAP's members have Web pages and provide information to the world on the Internet.  Some of the content provided by AAP's members contains nudity or sexual conduct.  Many of the efforts to ban books in various communities have been directed at books published by AAP's members, and AAP fears that the Act will spawn similar efforts directed at AAP's online publishing. If the Act is not enjoined, AAP members will be forced either to risk criminal liability or to stop providing online access to constitutionally protected books and other related materials.

**Freedom to Read Foundation, Inc.**

102.    Plaintiff FTRF and its library and librarian members, both public and private, serve as both access and content providers on the Internet.  Because the Internet offers their patrons a unique opportunity to access information for free, many libraries provide their patrons with facilities that patrons can use to access the Internet.  Many libraries also have their own Web sites on the Internet and use the Internet to post card catalogues, to post information about current events, to sponsor chat rooms, to provide textual information or art, or to post online versions of materials from their library collections.  Patrons can, for example, access the Web site of certain libraries from anywhere in the country to peruse the libraries' card catalogues, review an encyclopedia reference, or check a definition in the dictionary.

103.    Some of the materials provided or made available by libraries contain nudity or sexual conduct.  For example, FTRF member libraries' online card catalogues include such works as <u>Forever</u> by Judy Blume, <u>Women on Top</u> by Nancy Friday, <u>Changing Bodies, Changing Lives</u> by Ruth Bell, <u>Our Bodies, Our Selves</u> by the Boston Women's Health Collective and <u>It's Perfectly Normal</u> by Robie Harris.

104.    If the Act is not enjoined, libraries will be inhibited from both posting and providing access to materials on the Internet that contain nudity or sexual conduct.  Adult library patrons and Internet users would thus be deprived of access to these constitutionally protected library materials.  Given the global and unrestricted nature of the Internet and the past attempts by persons to bar literature and reference items from library collections, many of FTRF's members may choose not to post a substantial amount of expressive material at all—material that many adults might consider useful for themselves or their own children—rather than risk prosecution for posting material that might be illegal in Vermont.

**The National Association of Recording Merchandisers**

105.    Some of NARM's members are online music retailers who market their recordings by permitting Internet users to download music samples before making a purchase with their credit cards.  Permitting users to sample music before identifying themselves is an important feature of this marketing strategy.  NARM members are concerned that they may be exposed to criminal liability under the Act simply for misjudging what may be deemed "harmful to minors" under an ambiguous standard.

**Northshire Information, Inc.**

106.    Plaintiff Northshire , in addition to operating two "bricks and mortar" bookstores in Manchester Center, Vermont, operates a large Web site accessible through a series of addresses highlighting the variety of First Amendment products that it stocks.  The master address is www.northshire.com; www.vinylbarn.com leads to the used and collectible vinyl division of the store; www.Vermontbooks.com and www.Vermontbookstore.com highlight books, music and other materials from Vermont authors, artists and craftsmen; and www.usedbooks.com directs a customer to the used and collectable books division of the store.  Northshire stocks a wide variety of books.  Its Web site currently offers approximately 275,000 titles, including books, videos, magazines, books on tape, music and calendars.

107.    The titles that Northshire carries include both fiction and non-fiction works about sexual relationships, both heterosexual and homosexual.  The Web site announces and describes recent books and other materials of interest.  The Web site also offers an e-mail newsletter discussing upcoming events, new books not to miss, and other matters considered to be of interest.  Were the Act to be enforced, Northshire would be "chilled" in determining what materials would be featured and described, and how they would be featured and described.

108.    Plaintiff Northshire fears prosecution under the Act because its Web site on occasion contains material that may be considered by some to be "harmful to minors."  For example, covers of recordings sometimes contain nude images.

**PSINet, Inc.**

109.    Plaintiff PSINet is a commercial Internet service provider and currently operates one of the world's largest and most advanced global Internet Protocol ("IP") data communications networks.  Headquartered in Ashburn, Virginia, with more than 900 points of presence ("POPs") around the world, PSINet delivers a wide variety of Internet-related functions to nearly 100,000 business accounts on five continents, including dedicated and dial-up access to the Internet, hosting of Web sites, e-mail and other managed applications, and electronic commerce solutions.

110.    PSINet's clients include a broad variety of businesses, from Fortune 500 companies to sole proprietorships, as well as government agencies, non-profit organizations, and educational institutions.  PSINet also provides wholesale and private label Internet access services to telecommunications carriers and other Internet service providers for resale to their own customers, including both business and individual ('residential" or "consumer") customers.  Through these telecommunications carriers and ISPs, as well as its own subsidiaries, PSINet serves millions of consumer accounts (in addition to its business accounts) worldwide.

111.    PSINet fears that it could be alleged to "distribute" materials that are "harmful to minors" within the meaning of the Act, primarily through the activities of its customers as both content providers and as "users" of content provided by others over the Internet.

112.    A major component of PSINet's business is to provide Web hosting services to thousands of companies in the United States and around the world.  PSINet's Web servers are

located throughout the globe, including its twelve major hosting centers in Herndon, Virginia; New York, New York; Los Angeles, California; Atlanta, Georgia; Dallas, Texas; Toronto, Ontario; London, England; Geneva, Switzerland; Amsterdam, the Netherlands; Rio de Janeiro, Brazil; Seoul, South Korea; and Tokyo, Japan.  Any one of PSINet's Web hosting customers could, at any time, upload material allegedly "harmful to minors" to its account on one of PSINet's Web servers, thereby making that material available to "distribute" over the global Internet.

113.    Even assuming that PSINet could do so consistently with its customers' legitimate expectations to post lawful content on PSINet's Web servers, it would be impossible for PSINet somehow to block access to all such content for Vermont residents, in order to prevent it from being accessed by a Vermont minor.  Any such blocking attempts could cause severe disruptions to the functioning of the PSINet's global network, and the costs would likely be prohibitive.

114.    Additionally, PSINet fears that it could be alleged to "distribute" materials that are "transmitted" or "stored electronically" and "harmful to minors" within the meaning of the Act by providing e-mail and other application services that are used both by PSINet's direct customers and by the customers of those ISP's and telecommunications carriers who resell PSINet's Internet access services.  The use of PSINet's network facilities to send an e-mail message, for example, that contains images or words allegedly "harmful to minors" could thus subject PSINet to prosecution under the Act.  PSINet could also be alleged to fall within the prohibitions of the Act when those using PSINet's global network facilities—including juveniles in the households of its several million residential customers—access sexually explicit materials online.

115.    If the Act is not enjoined, PSINet will be placed in a situation in which it must choose between risking criminal prosecution, and pursuing its legitimate and socially beneficial business as a provider of Internet services.

**Recording Industry Association of America, Inc.**

116.    Members of Plaintiff RIAA produce the vast majority of sound recordings in the United States, some of which include sexually frank lyrics.  Some of these recordings (or portions thereof) are available to the public on the Internet.

117.    RIAA members are concerned that the Act requires them to censor the online version of their recordings.  For this reason, RIAA believes that the Act imposes unconstitutional press censorship that substantially limits the Internet's potential to enhance the diversity, availability, timeliness, quality, and utility of music online by creating a powerful disincentive for the use of interactive media technologies.

118.    If the Act is not enjoined, RIAA members might be criminally liable for content that contains descriptions of sexual conduct or nudity if they do not self-censor.

**The Sexual Health Network, Inc.**

119.    Plaintiff The Sexual Health Network's Web site (Sexualhealth.com) includes a wide array of sex education materials for people with disabilities and chronic diseases.  Some resources are written specifically for The Sexual Health Network, while other materials are adapted from a variety of sources. Topics covered include both general matters (such as information about the effects of aging on sexuality, or ideas to help increase women's sexual pleasure), to disability-specific issues (such as sexual positions that may enhance intercourse for individuals with particular disabilities, or advice on dealing with low sexual self-esteem that may accompany a disability).

120.    The articles and other information available on Sexualhealth.com necessarily involve the use of sexually explicit language and visual images.  Frank, detailed explanations are given in order for the information that the site provides to be useful to its viewers.

121.    Sexualhealth.com also includes forums where individuals may ask each other questions and share information.  This interactive feature helps to keep people coming back to the site, because it provides constantly changing content, and allows individuals—who may be geographically isolated from others with similar disabilities or illnesses—to experience a "support group" environment.

122.    The Sexual Health Network's Web site also provides links to other sexuality-related sites such as the Sinclair Intimacy Institute (producers of explicit educational videos designed to help couples improve their sex lives).

123.    The Sexual Health Network fears that making the materials on the Sexualhealth.com site available online could be alleged to constitute "distribution" of "harmful to minors" material and thus subject it to prosecution under the Act.

124.    If the Act is not enjoined, the Sexual Health Network must choose between risking criminal prosecution or curtailing its speech by removing from its site any material that could be alleged to be "harmful to minors."

## CAUSES OF ACTION

### COUNT I

**Violation of Adults' Rights Under the First and Fourteenth
Amendments of the United States Constitution**

125.    Plaintiffs repeat and re-allege paragraphs 1 – 124 as if set forth entirely herein.

126.    The Act violates the rights of plaintiffs, their members, and their users under the First and Fourteenth Amendments of the United States Constitution on its face and as applied because it effectively bans constitutionally protected speech by and between adults.

127.    The Act violates the rights of plaintiffs, their members, and their users under the First and Fourteenth Amendments to the United States Constitution because it is not the least restrictive means of accomplishing any compelling governmental purpose.

128.    The Act violates the the rights of plaintiffs, their members, and their users under First and Fourteenth Amendments to the United States Constitution because it is substantially overbroad.

### COUNT II

**Violation of Minors' Rights Under the First and
Fourteenth Amendments of the United States Constitution**

129.    Plaintiffs repeat and re-allege paragraphs 1 – 124 as if set forth entirely herein.

130.    The Act violates the rights of plaintiffs, their members, and their users under the First and Fourteenth Amendments to the United States Constitution because it interferes with the rights of minors to access and view material that to them is protected by the First Amendment.

131.    The Act is unconstitutional because it prohibits the dissemination to all minors of any material that is deemed "harmful to minors" of any age, despite the fact that some of the material has value for older minors.

132.    The Act violates rights of plaintiffs, their members and their minor users under the First and Fourteenth Amendments because it is substantially overbroad.

## COUNT III

**Violation of the Right to Communicate and Access Information Anonymously
Under the First and Fourteenth Amendments of the United States Constitution**

133.    Plaintiffs repeat and re-allege paragraphs 1 – 124 as if set forth entirely herein.

134.    The Act violates the the rights of plaintiffs, their members, and their users under the First and Fourteenth Amendments to the United States Constitution to communicate and access information anonymously, insofar as it effectively requires Internet users to identify themselves in order to gain access to constitutionally-protected speech.

## COUNT IV

**Violation of the Commerce Clause
Of the United States Constitution**

135.    Plaintiffs repeat and re-allege paragraphs 1 – 124 as if set forth entirely herein.

136.    The Act violates the rights of plaintiffs, their members, and their users under the Commerce Clause because it regulates communications that take place wholly outside of the State of Vermont.

137.    The Act violates the rights of plaintiffs, their members, and their users under the Commerce Clause because it constitutes an unreasonable and undue burden on interstate and foreign commerce.

138.    The Act violates the rights of plaintiffs, their members, and their users under the Commerce Clause because it subjects interstate use of the Internet to inconsistent regulations.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully request that the Court:

A.    Declare that Section 7 of Act 124, 1999 Vt. Acts & Resolves 124 (amending 13 V.S.A § 2802(a)), violates the First, Fifth and Fourteenth Amendments and the Commerce Clause of the United States Constitution;

B.    Preliminarily and permanently enjoin defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from enforcing that provision;

C.    Award plaintiffs their reasonable costs and fees pursuant to 42 U.S.C. § 1988; and

D.    Grant plaintiffs such other and further relief as the Court deems just and proper.

Respectfully submitted,

Charles Platto
Nolan Burkhouse
Sarah Shelburne North
Law Offices of Charles Platto, PLC
P.O. Box 1111
8 Beaver Meadow Road
Norwich, VT 05055
(802) 649-8400

Michael A. Bamberger
Sonnenschein Nath & Rosenthal
1221 Avenue of the Americas
New York, New York  10020
(212) 768-6700

Attorneys for Plaintiffs

David Putter
Putter & Edson LLP
15 E. State Street
Montpelier, VT
(802) 229-0932

Attorney for Plaintiff American Civil
Liberties Union of Vermont

Dated: February  7, 2001

# EXHIBIT A

## Vermont Acts and Resolves
## 1999-2000 Legislative Session

NO. 124. AN ACT RELATING TO INTERNET CRIMES.

(S.314)

It is hereby enacted by the General Assembly of the State of Vermont:

Sec. 1. 13 V.S.A. § 2 is amended to read:

## § 2. CRIMES COMMITTED PARTLY OUTSIDE STATE

A person who, with intent to commit a crime, does an act within this state in execution or part execution of such intent, which culminates in the commission of a crime either within or without this state, shall be punished for such crime in this state in the same manner as if the same had been committed entirely within this state. A crime committed by means of an electronic communication, including a telephonic communication, shall be considered to have been committed at either the place where the communication originated or the place where it was received.

. . .

Sec. 7. 13 V.S.A. § 2802(a) is amended to read:

(a) No person may, with knowledge of its character and content, sell, lend, distribute or give away to a minor:

(1) Any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image, including any such representation or image which is communicated, transmitted, or stored electronically, of a person or portion of the human body which depicts nudity, sexual conduct or sado-masochistic abuse and which is harmful to minors; or

(2) Any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in *[paragraph]* subdivision (1) *[hereof]* of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct or sado-masochistic abuse and which, taken as a whole, is harmful to minors.

**EXHIBIT B**

**VERMONT STATUTES**

**TITLE 13: Crimes and Criminal Procedure**

*CHAPTER 063: OBSCENITY*

. . .

**§ 2802. Disseminating indecent material to minors**

(a) No person may, with knowledge of its character and content, sell, lend, distribute or give away to a minor:

    (1) Any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image, including any such representation or image which is communicated, transmitted, or stored electronically, of a person or portion of the human body which depicts nudity, sexual conduct or sado-masochistic abuse and which is harmful to minors; or

    (2) Any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in subdivision (1) of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct or sado-masochistic abuse and which, taken as a whole, is harmful to minors.

**TITLE 13: Crimes and Criminal Procedure**

*CHAPTER 001: GENERAL PROVISIONS*

. . .

**§ 2. Crimes committed partly outside state**

A person who, with intent to commit a crime, does an act within this state in execution or part execution of such intent, which culminates in the commission of a crime either within or without this state, shall be punished for such crime in this state in the same manner as if the same had been committed entirely within this state. A crime committed by means of an electronic communication, including a telephonic communication, shall be considered to have been committed at either the place where the communication originated or the place where it was received. (Amended 1999, No. 124 (Adj. Sess.), § 1.)

**EXHIBIT C**

**VERMONT STATUTES**

**TITLE 13: Crimes and Criminal Procedure**

*CHAPTER 063: OBSCENITY*

**§ 2801. Definitions**

As used in this act:

(1) "Minor" means any person less than eighteen years old.

(2) "Nudity" means the showing of the human male or female genitals, pubic area or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernably turgid state.

(3) "Sexual conduct" means acts of masturbation, homosexuality, sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, breast.

(4) "Sexual excitement" means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

(5) "Sado-masochistic abuse" means flagellation or torture by or upon a person clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed.

(6) "Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sado-masochistic abuse, when it:

> (A) Predominantly appeals to the prurient, shameful or morbid interest of minors; and

> (B) Is patently offensive to prevailing standards in the adult community in the state of Vermont as a whole with respect to what is suitable material for minors; and

> (C) Is taken as a whole, lacks serious literary, artistic, political, or scientific value, for minors.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

AMERICAN BOOKSELLERS FOUNDATION
FOR FREE EXPRESSION; AMERICAN CIVIL
LIBERTIES UNION OF VERMONT; ASSOCIATION
OF AMERICAN PUBLISHERS; FREEDOM TO READ
FOUNDATION; NATIONAL ASSOCIATION OF
RECORDING MERCHANDISERS; NORTHSHIRE
INFORMATION, INC.; PSINET INC.; RECORDING
INDUSTRY ASSOCIATION OF AMERICA, INC.;
THE SEXUAL HEALTH NETWORK, INC.,

       Plaintiffs,

       v.

HOWARD DEAN, in his official capacity as
GOVERNOR OF THE STATE OF VERMONT;
WILLIAM H. SORRELL, in his official
capacity as ATTORNEY GENERAL OF THE
STATE OF VERMONT; LAUREN BOWERMAN,
DAN M. DAVIS, KEITH W. FLYNN, DALE O. GRAY,
JAMES A. HUGHES, VINCENT ILLUZZI,
JAMES D. McKNIGHT, JAMES P. MONGEON,
JOEL W. PAGE, JOHN T. QUINN, GEORGE E. RICE,
ROBERT L. SAND, TERRY J. TRONO,
and WILLIAM D. WRIGHT, in their official capacities
as VERMONT STATE'S ATTORNEYS,

       Defendants.

Civil No.1:01-CV-46

## CERTIFICATE OF SERVICE

       I hereby certify that on February 16, 2001 I served by facsimile and U. S.
Mail a true copy of a corrected page 10 from the Complaint to counsel of record as listed
below:

       William H. Sorrell, Esquire
       Joe Winn, Esquire
       Vermont Attorney General's Office
       109 State Street
       Montpelier, VT 05609-1001
       Fax No. (802) 828 2154

Michael A. Bamberger, Esquire
Sonnenschein Nath & Rosenthal
1221 Avenue of the Americas
New York, New York  10020
Fax No. (212) 391 1247

David Putter, Esquire
Putter & Edson LLP
15 E. State Street
Montpelier, VT  05602-3010
Fax No. (802) 828 2023

Markus Brakhan, Esquire
P.O. Box 5851
Burlington, VT  05402-5851
Fax No. (802) 660-8211

Sarah S. North